IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

In re: )
)
"PAYSAGE BORDS DE SEINE," 1879 )
UNSIGNED OIL PAINTING ON LINEN BY )
PIERRE-AUGUSTE RENOIR )
_____ )  1:13cv347 (LMB/TRJ)
)
UNITED STATES OF AMERICA, )
)
    Plaintiff, )
)
v. )
)
BALTIMORE MUSEUM OF ART, et al., )
)
    Claimants. )

### MEMORANDUM OPINION

Before the Court is claimant Baltimore Museum of Art's Motion for Partial Summary Judgment. For the reasons stated in open court and in this Memorandum Opinion, the motion will be granted, and claimant Marcia Fuqua's Claim to Property and Cross-Claim will be dismissed.

### I. BACKGROUND

The subject of this interpleader action is an 1879 unsigned oil painting by Pierre-Auguste Renoir, entitled "Paysage Bords de Seine" (the "Painting"). See Compl. ¶¶ 4-5. For purposes of this litigation, the first recorded owner of the Painting was Herbert May, who purchased it from a dealer in Paris, France. In 1935, his wife Saidie May wrote a letter to the Baltimore Museum of Art ("BMA" or

the "Museum") explaining that she owned the Painting and was interested in loaning it to BMA, as she had done with several other works. See Mem. in Supp. of Mot. for Summ. J. ("BMA's Mem."), Ex. 1-A. Specifically, she wrote that she was willing to loan four Renoir paintings, including the Painting at issue, to BMA indefinitely, provided the Museum would insure them, and indicated the Painting's value to be $1,010. Id.

BMA's agreement to accept the loan is reflected in two inventories. First, a "revised list," dated May 3, 1937, shows "receipt" of paintings "offered as loan[s]" from Saidie May and includes the same four Renoir paintings listed in her 1935 letter. See id. at Ex. 1-B. Second, a December 1940 listing shows that the Painting was part of BMA's Saidie A. May Collection of Modern Art Loans and Gifts and was valued at $1,000. See id. at Ex. 1-D. BMA also gave the Painting an alpha-numeric designation, which it recorded on a catalog card bearing the Painting's English title ("On the Shore of the Seine"), artist ("Pierre-Auguste Renoir"), medium ("Oil on linen napkin"), size ("5 ½ [inches] x 9 [inches]"), and lender ("Saidie A. May"). See id. at Ex. 1-C. The Painting was displayed in two public exhibitions, first in a March 1950 exhibition entitled "Saidie A. May Collection of Modern Paintings and Sculpture"

2

and again in a November 1951 exhibition entitled "From Ingres to Gauguin." See id. at Ex. 1-E, 1-F.

During the second exhibition the Painting disappeared. BMA reported it as stolen to the City of Baltimore Police Department on November 17, 1951. Id. at Ex. 2. The resulting police report described the Painting as an "Oil on canvas painting, Canvas size 5 ½ X 9 [inches], painted by Pierre Auguste Renoir, Titled 'On the Shore Of The Seine,' A River scene in pink and blue, weeds in green, in a Gilt frame size 8 X 12 [inches] Val. $2500.00, Insured." Id. Minutes from a BMA Executive Board meeting held on February 4, 1952, show that BMA's "insurance company [had] agreed to pay the Museum $2,500 in compensation for the Renoir painting from the May collection which was stolen from the French show." Id. at Ex. 1-G. A BMA financial ledger likewise shows that on March 4, 1952, Fireman's Fund Insurance Company made a $2,500 "payment of claim" for the "theft of ptg. by Renoir: 'On the Shore of the Seine.'" Id. at Ex. 1-H.

According to claimant Marcia Fuqua ("Fuqua"), the Painting resurfaced in 2008 or 2009 at a flea market in West Virginia, where she purchased it for $7. See Compl., Ex. C. After learning of its valuable nature, Fuqua contacted the Potomack Company in September 2012 to have the Painting sold at auction. Id. Just days before the scheduled auction, BMA uncovered internal records confirming

3

that it had owned the Painting until 1951, at which time it was stolen from its collection. BMA's Mem., Ex. 1. BMA then contacted the Federal Bureau of Investigation ("FBI"), which obtained a civil seizure warrant under which the Painting was taken into custody. Compl. ¶ 4. The FBI has been holding the Painting in Manassas, Virginia, ever since. Id.

On March 15, 2013, the United States filed this interpleader action, asking the Court to determine to whom the Painting rightfully belongs. See id. ¶ 6. The Complaint identified a number of potential claimants: BMA, Fuqua, Fireman's Fund Insurance Company, the Potomack Company, Amalie Ascher (heir of Saidie May), and the undetermined heirs of Herbert May (as it was unknown how or if Saidie May acquired an ownership interest in the Painting). Id. Only two claimants remain at this stage in the litigation. Ascher wrote to the Court asking to be dismissed from the action, a request the Court granted. See Order of June 25, 2013. The Court then entered default judgment against the Potomack Company and two later-identified heirs of Herbert May because they failed to respond to the Complaint. See Default J. of August 28, 2013. Finally, Fireman's Fund Insurance Company assigned its rights to BMA and was thereafter voluntarily dismissed. See Stipulation of Dismissal.

4

On December 3, 2013, BMA filed a Motion for Partial Summary Judgment, in which it argued that it has superior title based on evidence that the Painting was stolen from its collection. Fuqua opposed the motion, countering that BMA's supporting evidence is inadmissible.

## II. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate where the record demonstrates "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Accordingly, the question on summary judgment is "whether a reasonable jury could find in favor of the non-moving party, taking all inferences to be drawn from the underlying facts in the light most favorable to the non-movant[.]" In re Apex Express, 190 F.3d 624, 633 (4th Cir. 1999). To survive a summary judgment motion, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict." Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 57 F.3d 1317, 1323 (4th Cir. 1995) (citation omitted). That means the non-moving party may not rest upon a "mere scintilla"

of evidence, but must instead offer specific facts supporting its position. See Celotex, 477 U.S. at 324; accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). In other words, once the moving party demonstrates that it is entitled to judgment as a matter of law, the burden shifts to the non-moving party to identify facts showing that there is a genuine issue for trial. See Pulliam Inv. Co. v. Cameo Prop., 810 F.2d 1282, 1286 (4th Cir. 1987).

### B. Determining Ownership

The United States brought this interpleader action pursuant to Fed. R. Civ. P. 22 and the Federal Interpleader Act, 28 U.S.C. § 1335, both of which provide a vehicle for a stakeholder faced with conflicting claims to a res -- such as the FBI here -- to escape the responsibility of assessing which claim among many is best. See generally 7 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1702 (3d ed. 2001). An interpleader action is normally conducted in two stages. See, e.g., United States v. High Tech. Prods., Inc., 497 F.3d 637, 641 (6th Cir. 2007); Avant Petroleum, Inc. v. Banque Paribas, 853 F.2d 140, 143 (2d Cir. 1988). During the first stage, courts determine whether the action is appropriate and whether the stakeholder is entitled to bring the action. During the second stage, courts determine the rights of the competing claimants to the property or fund.

As to the first stage, the claimants do not dispute that this Court has subject-matter jurisdiction. As to the second stage, the claimants likewise do not dispute that Virginia law governs the resolution of this litigation.[1] Looking first to background principles, then, the Fourth Circuit has endorsed the truism "[t]hat possession is nine-tenths of the law." Willcox v. Stroup, 467 F.3d 409, 412 (4th Cir. 2006) (determining the ownership of Civil War-era documents). As such, the common law in Virginia recognizes "a rebuttable presumption . . . that those in possession of property are rightly in possession" -- that is, "actual possession is, prima facie, evidence of a legal title in the possessor." Id. (internal quotation marks and citations omitted); see also State of Maine v. Adams, 672 S.E.2d 862, 867 (Va. 2009) ("The common law provides that possession of property constitutes prima facie evidence of ownership until a better title is proven."). That presumption undoubtedly favors Fuqua on the facts presented here. She claims to have purchased the Painting in good faith at a flea market in West Virginia, and she possessed the Painting until the FBI seized it. See Adams, 672 S.E.2d at 867. The burden thus lies with BMA, as the claimant out of possession, to rebut Fuqua's presumptive proof of

---

[1] Even if Virginia's choice-of-law rules required the Court to apply the law of another interested forum -- e.g., Maryland -- the outcome would be the same because a thief cannot pass good title in any relevant jurisdiction.

7

ownership by "produc[ing] evidence of superior title." Id. BMA does so by way of a detinue action, alleging that the Painting was stolen from its collection in November 1951.

The purpose of a detinue action is "the recovery of specific personal property." MacPherson v. Green, 87 S.E.2d 785, 789 (Va. 1955). For a detinue action to lie under Virginia law, a plaintiff must establish (1) a property interest in the thing sought to be recovered, (2) the right to immediate possession of the property, (3) that the property is capable of identification, (4) that the property is of some value, and (5) that the defendant had possession at some time before the institution of the action. Vicars v. Atl. Disc. Co., 140 S.E.2d 667, 670 (Va. 1965); see also York v. Jones, 717 F. Supp. 421, 427 (E.D. Va. 1989). Although it is not clear if Fuqua contests multiple individual elements, she definitely contests the first one. Accordingly, the dispositive question in this context is whether BMA can prove that it was "unlawfully divested" of possession of the Painting sometime before Fuqua acquired it. See Vicars, 140 S.E.2d at 672. In other words, the Court must determine whether the Painting was stolen from BMA. Proof of theft would rebut Fuqua's presumptive ownership because even a good-faith purchaser for value cannot acquire title to stolen goods. Toyota Motor Credit Corp. v. C.L. Hyman Auto Wholesale, Inc., 506 S.E.2d 14, 16 (Va. 1998)

8

("Longstanding Virginia law provides that one who does not have title to goods cannot transfer title to a buyer, even a bona fide purchaser for value without notice.").

As explained in open court, the only conclusion to be drawn from the evidence presented by BMA is that it was in lawful possession of the Painting until the Painting was stolen from its collection in November 1951. To this end, BMA appended a number of affidavits and supporting exhibits to its memorandum. Internal records, discussed above, indicate that BMA received the Painting as a loan from Saidie May, cataloged the Painting, and put it on exhibit before reporting it stolen.[2] See BMA's Mem., Ex. 1. Of particular significance is the police report, which demonstrates that BMA reported the Painting as stolen to the City of Baltimore Police Department on November 17, 1951. See id. at Ex. 2. The theft is further corroborated by BMA's records, including handwritten and typed notations on the catalog card reflecting the Painting's status as stolen, id. at Ex. 1-C; minutes from a board meeting stating that BMA made an insurance claim as a result of the theft, id. at Ex. 1-G; and BMA's financial ledger confirming that it received a $2,500 payment from its insurer, id. at Ex. 1-H. Together these records

---

[2] All such records are accompanied by an authenticating affidavit from Emily Rafferty, the current Head Librarian and Archivist for BMA. See BMA's Mem., Ex. 1.

9

offer overwhelming evidence in support of BMA's claim that the Painting was stolen. Given this quantum of evidence, there can be no doubt that BMA has proved all it must under Virginia law, and that Fuqua cannot have good title as the possessor of a stolen work of art.

This conclusion is consistent with Brown University v. Tharpe, No. 4:10cv167, 2013 WL 2446527 (E.D. Va. June 5, 2013), a detinue action involving a stolen Tiffany presentation sword to which both parties have cited in their papers. In that case, Brown University brought an action against Tharpe seeking to recover the sword, id. at *1, which had gone missing from Brown's collection sometime between 1975 and 1977, a fact that was documented in a memo to the Provost but, unlike the instant case, had not been reported to the police or the insurance company out of concern for the institution's reputation, id. at *7. The sword reappeared thirty years later when Tharpe purchased it in good faith from a collector. Id. Despite evidentiary shortcomings not present here, the court found in favor of Brown on the basis of a typewritten card identifying the sword as part of Brown's holdings and the testimony of an employee who had observed the sword in Brown's collection, both of which established prior possession. Id. at *6. The court then inferred that the sword had been stolen based on evidence that its display case remained in

the same place after its disappearance and that several other items in the vicinity were also missing, even though Brown had a policy prohibiting removal for any purpose other than repair and restoration. Id. To the extent Tharpe is instructive at all, it merely bolsters BMA's position that the evidence before the Court is more than adequate to make out a detinue claim.

Rather than counter BMA's evidence, Fuqua attempts to manufacture a factual dispute by arguing that the filing of the BMA catalog card under "returned loans" indicates that the Painting "was returned to Saidie May . . . at some point in time" before its alleged theft. See Opp. to the BMA's Mot. for Partial Summ. J. ("Opp.") 28. Fuqua ignores the many other records -- such as the board meeting minutes, financial ledger, and especially the police report -- that prove the Painting was in BMA's possession until it was stolen. Fuqua also speculates that Saidie May might never have had actual ownership of the Painting, insinuating that she loaned her husband's property without his permission. Id. This argument is not consistent with any evidence in the record and therefore comes up short because summary judgment cannot be defeated by speculation alone.

Fuqua ultimately fails to offer a scintilla of evidence that the Painting was not stolen from BMA. See Celotex, 477 U.S. at 324

11

(holding that an adverse party must state specific facts showing there is a genuine issue of fact for trial). She has not provided a compelling factual counter-narrative, which, construed in the light most favorable to her, would allow a reasonable jury to draw enough inferences to return a favorable verdict. See Apex Express, 190 F.3d at 633. Regarding the dispositive question of who has better title as between these two claimants, all of the evidence shows BMA had possession of the Painting before BMA was unlawfully divested of it, see Vicars, 140 S.E.2d at 672, which is sufficient to establish that Fuqua, as a subsequent owner, could not have a superior claim to title, see Toyota Motor, 506 S.E.2d at 16.

C. Evidentiary Objections

Instead of presenting her own evidence, Fuqua chooses to stake her Opposition on a series of objections to BMA's evidence. Generally speaking, only competent admissible evidence is eligible for consideration on summary judgment. See Greensboro Professional Fire Fighters Ass'n v. City of Greensboro, 64 F.3d 962, 967 & n.5 (4th Cir. 1995); accord Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."). Even though affidavits are often inadmissible as evidence at trial, they constitute a significant exception to the usual rule for purposes

of summary judgment proceedings. Specifically, under Fed. R. Civ. P. 56(c)(4), affidavits may be offered in support of summary judgment if they are made on personal knowledge and set forth facts that would otherwise be admissible.

Fuqua tries to keep the BMA internal records out of consideration, attacking the manner in which they were authenticated by an affidavit from Emily Rafferty, BMA's Head Librarian and Archivist. Fuqua also tries to prevent use of the police report, arguing that the statements recorded in it are inadmissible hearsay.[3] See Fed. R. Civ. P. 56(c)(2). Her objections, legion as they are, fall into two basic categories, which the Court will address in turn.

1. **BMA Internal Records**

Fuqua lodges a blanket objection to the admissibility of BMA's internal records, arguing that they were improperly authenticated as ancient documents or business records and therefore do not warrant an exception to the rule against hearsay. See Opp. 16. Fed. R. Evid. 803 provides "exceptions" to the hearsay rule for certain out-of-court statements that are otherwise considered reliable evidence, including statements made in ancient documents. Under that exception, courts may admit into evidence a "statement in a

---

[3] She has done so in her Opposition, although a motion to strike is the usual vehicle for challenging the admissibility of materials submitted in support of a motion for summary judgment. See F.D.I.C. v. Cashion, 720 F.3d 169, 176 (4th Cir. 2013).

document that is at least 20 years old and whose authenticity is established." Fed. R. Evid. 803(16). Authenticity in turn hinges on whether the document "(A) is in a condition that creates no suspicion about its authenticity; (B) was in a place where, if authentic, it would likely be; and (C) is at least 20 years old when offered." Fed. R. Evid. 901(b)(8). As a general matter, documents are authenticated by evidence "sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Authenticity is therefore not an especially high hurdle for a party in a civil action to overcome. See United States v. Patterson, 277 F.3d 709, 713 (4th Cir. 2002).

Fuqua contends that BMA's internal records were not properly authenticated because Rafferty's affidavit "makes no direct or affirmative representations" regarding any one of the document's condition, placement, or age. Opp. 18. Fuqua further contends that "insofar as Ms. Rafferty's tenure at BMA did not begin until 2000 or 2001, she does not possess the personal knowledge to authenticate any of the documents." Id. BMA responds that Rafferty's affidavit "includes sufficient details and descriptions to establish both her qualifications and the basis of her personal knowledge of the documents, and to establish their age and location." BMA's Reply to Fuqua's Opp. ("Reply") 3. In addition, BMA points out that

14

Rafferty inspected the documents herself in her capacity as the Head Librarian and Archivist and identified them as legitimate BMA records. Id.

Contrary to Fuqua's contention, the internal records are exactly what they purport to be. See Fed. R. Evid. 901. Rafferty's authenticating affidavit is more than a bare recitation of their contents; the affidavit provides a measure of information regarding the style, appearance, and placement of each document, consistent with Fed. R. Evid. 901(b)(8).[4] The available circumstantial evidence supports the conclusion that the records were created contemporaneously with the decades-old transactions and events they describe, and then placed in BMA's archives until located by the affiant (or someone under the affiant's supervision, as the case may be).[5] See id. As such, the Court finds that BMA's internal records are not only admissible but particularly reliable because they are not vulnerable to the vagaries of human memory, as the declarants

---

[4] Especially as to proof of age, courts often consider circumstantial evidence that may be intrinsic or extrinsic to the document itself, including aspects of its appearance that are readily apparent to laypersons and even its contents where they permit an inference as to age by virtue of reference to events or persons contemporaneous with the document's creation. See 31 Charles Alan Wright et al., Federal Practice and Procedure § 7113 (1st ed. 2013).

[5] To the extent Fuqua could make a colorable argument that the original Rafferty affidavit left some question as to authenticity, the supplemental affidavit attached to BMA's Reply is conclusive. See Reply, Ex. 1.

whose statements they contain would have had firsthand knowledge of the events described. Lastly, Fuqua fails to bring forth any evidence of the records being fraudulently produced in response to this litigation.

Fuqua's secondary argument that ancient documents can only be authenticated by someone with personal knowledge of their creation is ridiculous, as it would undermine the very purpose of the relevant exception, which recognizes and addresses the problems caused when firsthand witnesses die, recollections fade, and alternative tangible evidence is lost with the passage of time.

Rafferty's affidavits are sufficient to establish the authenticity of the appended BMA records and they fully support the admissibility of the statements contained in those records under the ancient-documents exception to the hearsay rule. See Fed. R. Evid. 901(b)(8); Patterson, 277 F.3d at 713. Fuqua has not raised a single legitimate question as to the records' trustworthiness, especially in light of the low threshold for authentication.

2. City of Baltimore Police Department Report

Fuqua also objects to the admissibility of the police report, not out of any concern over authenticity, but because "statements within the report of what witnesses may have said to the officer are 'hearsay within hearsay'" that must be excluded. Opp. 22. It is

16

true that third-party statements in a police report, if not subject to another exception, are inadmissible hearsay. See United States v. Burruss, 418 F.2d 677, 678 (4th Cir. 1969) (holding that hearsay within a police report was inadmissible). It is just as true, however, that an out-of-court statement only qualifies as hearsay in the first instance if it is offered "to prove the truth of the matter asserted" therein. See Fed. R. Evid. 801(c)(2). If offered for a different purpose, for instance, to prove simply that a statement was made at a particular time, such a statement falls outside the scope of the hearsay rule. See id. Accordingly, BMA correctly counters that statements made by its official, James N. Foster, Jr., which are recorded in the report, are not offered to prove that the Painting was in fact stolen, but rather to establish simply that on November 17, 1951, BMA reported the Painting as stolen. Therefore, for that limited purpose, the statements in the police report are not hearsay under Fed. R. Evid. 801.

The police report strongly corroborates BMA's internal records, and together these documents establish that the Painting was stolen in November 1951. In light of such overwhelming evidence of BMA's lawful possession and the ensuing theft of the Painting, and Fuqua's

failure to present a scintilla of evidence to the contrary,[6] there is no genuine issue of material fact for which a trial is needed and judgment will be entered in BMA's favor.[7]

### III. CONCLUSION

For these reasons, BMA's Motion for Partial Summary Judgment [Dkt. No. 61] will be granted, and Fuqua's Claim to Property and her Cross-Claim against BMA [Dkt. No. 32] will be dismissed by an Order to be issued with this Memorandum Opinion.

Entered this 14th day of January, 2014.

Alexandria, Virginia

/s/
Leonie M. Brinkema
United States District Judge

---

[6] For example, given that the claimants had nearly five months to conduct discovery, Fuqua could have hired an expert to examine the age of the paper on which the BMA records were written or typed to determine whether it was consistent with 63-year-old documents, or had another expert analyze the handwriting of Saidie May's letter to determine if it was really she who loaned the Painting.

[7] Fuqua objects to the remainder of BMA's exhibits on various grounds, but the Court need not consider such objections because the strength of the foregoing admissible evidence supports a grant of summary judgment in favor of BMA.

18